# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**WILMA EBRIGHT,**

    **Plaintiff,**

v.

**CITY OF PICKERINGTON,**

    **Defendant.**

Case No. 2:16-cv-378
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Elizabeth P. Deavers**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 15), Plaintiff's Memorandum in Opposition (ECF No. 16), and Defendant's Reply in Support. (ECF No. 19.) Plaintiff brings this action alleging that Defendant terminated her employment in violation of the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), and Ohio Revised Code § 4112. Defendant moves to dismiss all claims. For the reasons that follow, Defendant's Motion is **GRANTED**.

## I. BACKGROUND

### A. Executive Assistant Position

Plaintiff, Wilma Ebright ("Ms. Ebright") began working for the city of Pickerington as a temporary employee on October 12, 2011. (Miller Aff. ¶ 2.) She served as a "floater" in various departments, engaging in administrative tasks such as answering phone calls, making copies, and directing customers. (Miller Dep. 25:4–8, ECF No. 14-2.) After successfully performing as a temporary employee, Ms. Ebright was given a full-time position of Administrative Assistant to the City Manager, William Vance ("Mr. Vance") on June 4, 2012. (Miller Aff. ¶ 3.) Ms.

Ebright's performance as executive assistant to Mr. Vance was reportedly less successful. (Vance Dep. 12:3–13, ECF No.14-4.)

Mr. Vance testified that Ms. Ebright made "tons of mistakes" and was not detail oriented. (Vance Dep. 12:3–13.) According to him, Ms. Ebright initially had more good days than bad, but she failed to set up meetings properly, coordinate his calendar correctly, or connect him with residents who made city service requests in a timely manner–all tasks important to her job. (*Id.*; Vance Dep. 13:4–11, 14:8–11, 17:15–24, 18:1–6.) Ms. Ebright recognized her shortcomings, including her late production of the annual report which contained many mistakes. (Ebright Dep. 98:11–24, 99:1–6, ECF No. 14-1.) At that point, she requested a meeting where she asked for a clean slate. (Ebright Dep. 99:1–22.) During the meeting, Mr. Vance explained to Ms. Ebright that she "needed to be the rock of the department." (Ebright Dep. 99:10–23.) She stated "that he didn't want me – if I had anything to do in the building, I needed to do it in the morning. He didn't want me to leave my desk. He wanted me to be at my desk at all times unless I went to lunch, and if I did leave my desk I was to have my – what everyone at the office called my Wilmaberry so that he could be in contact with me at any point." (Ebright Dep. 99:10–19.)

**B. Building Department Administrative Assistant**

After a year of working together, an opening became available in the building department as an Administrative Assistant and Mr. Vance decided to reassign Ms. Ebright to that position. (Vance Dep. 18:7–24, 19:1–9 ("There was an opening in the building department, and I thought as opposed to being discharged, Wilma, you know, could appreciate a second opportunity to continue her tenure with the City of Pickerington.").) On May 20, 2013, Ms. Ebright was officially reassigned to work in the building department and was assigned to report to Sandra

2

Whittington ("Ms. Whittington"), the building department manager. (Miller Aff. ¶ 4; Whittington Dep. at 11:5–7, ECF No. 14-3.)

### a. Training Period

From May through July 2013, Ms. Ebright was in a "training period" in her new position with the building department. (Miller Dep. 29:12–22, 30:10–24, 31:1–13.) Ms. Ebright allegedly struggled with the computer system, was making mistakes, and had conflicts with coworkers. (Whittington Dep. 26:10–22, 30:10–24; Ebright Dep. 153:17–24, 188:1–24, 189:1–7.) According to Ms. Whittington, Ms. Ebright made mistakes and then was not approachable to discuss the mistakes but instead would become argumentative and confrontational. (Whittington Dep. 26:10–12.) However, on July 22, 2013, Ms. Ebright received a conditional offer of employment for the Building Department Administrative Assistant position, which included the contingency of a six-month probationary period. (Miller Aff. ¶ 5.)

### b. Probationary Period

Ms. Ebright was offered Conditional Probationary Employment to begin on July 25, 2013. (Miller Dep. 76:13–19.) Based on Ms. Ebright's prior performance, Human Resources Director for the City of Pickerington, Lynn Miller ("Ms. Miller") and Ms. Whittington decided to implement "a development plan" to help Ms. Ebright improve. (Miller Dep. 18:15–24, 29:1–24, 30:1–24, 31:1–9.) Ms. Miller and Ms. Whittington met with Ms. Ebright to establish the expectations of her position. (Ebright Dep. 143:3–11.) They determined that there would be monthly meetings to evaluate her progress, in addition to the standard three-month oral evaluation all probationary employees receive. (Ebright Dep. 155:3–19; Miller Aff. ¶ 5; Whittington Dep. 61:5–18.) Although formal written reviews are not customary for the building department, in August, Ms. Whittington and Ms. Miller each began documenting Ms. Ebright's

3

performance in order to create a record of ongoing issues. (Whittington Dep. 45:14–23, 47:7–14; Miller Dep. 46:16–24, 47:1–4, 65:12–17.) Ms. Ebright also documented her office interactions. (Ebright Dep. 291:9–24, 292:1–7.) By all accounts, the documentation shows issues with Ms. Ebright's work performance and her relationship with coworkers.[1] Joe Henderson ("Mr. Henderson"), Development Services Director and Ms. Whittington's supervisor, testified that he observed Ms. Ebright act with hostility towards Ms. Whittington, including "[o]n multiple occasions I was able to observe and overhear conversations between Ms. Ebright and Ms. Whittington that I would call unprofessional for someone who is talking with their supervisor about work related topics." (Henderson Aff. ¶ 2, ECF No. 15-2.)

In the August monthly performance review meeting, Ms. Whittington noted Ms. Ebright had made "some positive strides towards accomplishing the department goals and expectations," indicating improvements in Ms. Ebright's performance. (Whittington Dep. 43:11–22.) Additionally, Ms. Whittington provided Ms. Ebright with a list of six areas that still needed improvement. (Miller Aff. ¶ 7.) At this point in time, it came to Mr. Vance's attention that Ms. Ebright was having difficulties in her new position. (Vance Dep. 67:1–24; 68:1–4.)

In September 2013, Ms. Miller cautioned Ms. Ebright about her actions in the office because Ms. Ebright continued experiencing personal conflicts with coworkers and work performance issues. (Miller Dep. 104:5–24; 105:1–18; 106:15–24; 107:1–24; 108:1–3.) That month, Ms. Ebright requested a meeting with Mr. Vance to discuss the reasons he reassigned her to the building department. (Ebright Dep. 191:12–13.)

---

[1] Ms. Whittington testified that Ms. Ebright was confrontational. She stated that "[Ms. Ebright] had a habit of if she's angry with you, she had no problem with getting right in your face, very close, like right in your personal space. I mean, there was one time . . . I honestly braced for her to slap me." (Whittington Dep. 66:2–7.)

4

On September 19, 2013, Mr. Vance, Ms. Ebright, and Ms. Miller met at Ms. Ebright's request. (Miller Aff. ¶ 10.) Mr. Vance explained that he reassigned her due to "poor performance." (Ebright Dep. 199:2–20.) Specifically, Ms. Ebright recalls that Mr. Vance told her that he transferred her because while she worked for him "I got worse, and if I didn't – right down here, 'If I am not getting better then I am getting worse.'" (Ebright Dep. 199:12–14.) When asked by Mr. Vance why she was unhappy in her new position, Ms. Ebright was unable to provide an answer. Mr. Vance gave her the rest of the day off, with pay, to consider the question. (Ebright Dep. 193:9–24, 194:17–24, 195:1–24; Vance Dep. 20:1–24, 21:1–5.)

The following day, September 20, 2013, Ms. Ebright met with Mr. Vance, Ms. Miller, and Mr. Henderson. (Ebright Dep. 200:15–17.) Ms. Ebright provided the group a list of issues to discuss. (Ebright Dep. 201:9–12.) From this meeting, it was apparent to Ms. Ebright that her job was in jeopardy. (Ebright Dep. 202: 18–23 (Q. "Did you get the impression from this meeting that your job was in jeopardy?" A. "Yes" Q. "Did you think you were going to be fired, maybe?" A. "At this point I did.").) Because Ms. Ebright expressed her desire to continue working at the City of Pickerington, Mr. Vance suggested she return to her department, apologize to her coworkers, and approach her position with a positive attitude. (Ebright Dep. 201:9–24, 202:1–17, 212:15–24, 213:1–4; Vance Dep. 22:14–24, 23:1.)

By this point in time, Ms. Whittington concluded she was not going to recommend that Ms. Ebright pass her six-month probationary period. (Whittington Dep. 47:3–14.) Mr. Vance also testified that he too concluded at this point Ms. Ebright was not successfully completing the probationary period. (Vance Dep. 38:21–24, 39:1–4.)

Plaintiff missed work from September 25, 2013 through September 27, 2013, and then also missed work on September 30, 2013. On September 26, 2013, Ms. Ebright visited her

doctor, Dr. Oberlander, because of "tension headaches related to stress," and pain associated with a degenerative disc. (Pl.'s Exhibit 12, ECF No. 16-12.) Dr. Oberlander diagnosed her with torticollis, episodic tension headaches, and anxiety. (Def.'s Exhibit 24, ECF No. 15-24.) After returning to work, on October 1, 2013 Ms. Ebright informed Ms. Miller that she needed to apply for Family Medical Leave, backdating to her absence from work on September 30, 2013, and Ms. Miller sent her the necessary paperwork. (Miller Dep. 68:1–4.)

On October 9, 2013, Dr. Oberlander provided further FMLA documentation. (Def.'s Exhibit 16, ECF No. 15-16.) The doctor noted that on occasion "it would be medically necessary for [Ms. Ebright] to be absent" from work because of stress-related tension headaches. (Def.'s Exhibit 16.) Dr. Oberlander estimated that flare-ups could happen up to eight times over the year, lasting one to two days. (Def.'s Exhibit 16.) After receiving the initial documentation, Ms. Miller sought further medical support for the requested FMLA leave. (Def.'s Exhibit 17, ECF No. 15-17.)

Ms. Ebright had an appointment on October 10, 2013, which was scheduled during her lunch hour. (Ebright Dep. 76:2–10.) Although the reasons are disputed, all parties agree Ms. Ebright left the office before her scheduled departure and did not return that day. (Ebright Dep. 53:9–11; Def.'s Exhibit 18, ECF No. 15-18.) Mr. Vance was informed of her departure when he visited the department in the afternoon of October 10 as part of his routine rounds. (Vance Dep. 28:6–15; 29:19–23; 40:10–24; 41:1–5; 67:1–3.) After learning of her "unexpected" absence, Mr. Vance placed Ms. Ebright on paid administrative leave that day. (Vance Dep. 29:13–18.)

### c. Administrative Leave

After placing Ms. Ebright on leave, Mr. Vance and Ms. Miller met and reviewed Ms. Miller's notes, Ms. Whittington's notes, and discussed Ms. Ebright's work performance. (Vance

6

Dep. 39:11–24, 40:1–24, 34:14–42:16; Miller Dep. 112:10–15, 113:13–16.) After evaluating Ms. Ebright's work performance, Mr. Vance decided to terminate her employment. (Vance Dep. 30:1–6, 26:7–20.)

The same day, October 10, 2013, Ms. Miller received an additional FMLA Certification of Healthcare Provider. (Def.'s Exhibit 15, ECF No. 15-20.) On October 11, 2013, Ms. Ebright's FMLA leave request was approved for an absence on September 30, 2013. (Pl.'s Exhibit 12, ECF No. 16-12.) Subsequently, on October 22, 2013, Ms. Ebright was terminated. (Def.'s Exhibit 23, ECF No. 15-23.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to the party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). A genuine issue of material fact exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts") (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### III. LAW AND ANALYSIS

Plaintiff brings claims for retaliation and discrimination. Defendant moves for judgment on all claims.

#### A. Retaliation Under the FMLA

Under the FMLA, it is unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a)(2). Employers who violate the FMLA are liable to the employee for damages and such equitable relief as may be appropriate. 29 U.S.C. § 2617(a)(1).

The Sixth Circuit "has recognized two discrete theories of recovery under the FMLA: (1) the so-called 'interference' or 'entitlement' theory arising from § 2615(a)(1), and (2) the 'retaliation' or 'discrimination' theory arising from § 2615(a) (2)." *Seeger v. Cincinnati Bell Tel.*

8

*Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (citing *Hunter v. Valley View Local Sch.*, 579 F.3d 688, 691 (6th Cir. 2009)). Plaintiff alleges an FMLA claim under the second theory.

For an FMLA retaliation claim, a plaintiff must establish that: she availed herself of a protected right under FMLA; she suffered an adverse employment action; and there exists a causal connection between the protected FMLA activity and the adverse employment action. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). Additionally, a plaintiff must establish the employer knew of the protected activity. *Mays v. American Electric Power*, Case No. 2:08-cv-1124, 2010 LEXIS 96369, at *28–29 (S.D. Ohio 2010) (citing *Edgar*, 443 F.3d at 507–08)). "The employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Edgar*, 443 F.3d at 508.

When a plaintiff presents only circumstantial evidence of retaliation, retaliation claims are analyzed under the same *McDonnell Douglas/Burdine* framework used to assess discrimination claims. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Accordingly, because Ms. Ebright does not proffer any direct evidence regarding retaliation, the Court examines her retaliation claim using the burden-shifting framework.

Under this framework, Ms. Ebright has the initial burden to establish a *prima facie* case of retaliation under the FMLA. If she establishes a *prima facie* case, the burden of production shifts to Defendant to "articulate some legitimate, nondiscriminatory reason for [her termination]." *McDonnell Douglas*, 411 U.S. at 802. If Defendant succeeds in doing so, then the burden shifts back to Plaintiff to demonstrate that Defendant's "proffered reason was not the

9

true reason for the employment decision." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007) (quoting *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000)) (internal quotations omitted).

### 1. *Prima Facia* Case for Retaliation

All parties agree Ms. Ebright was placed on paid administrative leave on October 10, 2013. (Miller Dep. 11:12–17; Ebright Dep. 206:19–21, 238:10–22.) It is further undisputed that Ms. Ebright suffered an adverse employment action when she was terminated on October 22, 2013. Ms. Ebright argues that she was terminated because she had left work on October 10, 2013 to go to a doctor's appointment, which she states was covered by FMLA leave. (Ebright Dep. 76:2–10.) The City, however, contends that it let Ms. Ebright go after multiple instances of her leaving during the work day, conflicts with coworkers, and poor performance issues. (Vance Dep. 46:9–24, 47:1–6.)

#### a. Knowledge

To establish an actionable retaliation claim, Ms. Ebright must show that the decision-maker knew of her protected activity. *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007) ("The decision maker's knowledge of the protected activity is an essential element of the *prima facie* case of unlawful retaliation."); *Evans v. Prof'l Transp., Inc.*, 614 F. App'x 297, 300–01 (6th Cir. 2015) ("General corporate knowledge will not suffice.").

Here, Mr. Vance ultimately decided to terminate Ms. Ebright's employment. (Ebright Dep. 202:21–23.) Defendant admits that Mr. Vance had some knowledge that Ms. Ebright was suffering from general neck pain, but contends Mr. Vance was unaware of her formal request for medical leave until after his decision to terminate her had been made. (Vance Dep. 31:14–21, 50:11–22, 55:3–12.) The issue of knowledge in this case turns on whether Mr. Vance had the

requisite information as to Ms. Ebright's requested FMLA leave when he placed her on administrative leave and decided to terminate her that day.[3]

Ms. Ebright points to her request for leave, which bears Mr. Vance's signature and is dated October 1, 2013. (Pl.'s Exhibit 10, ECF No. 16-10.) The form notes a request for eight hours of leave on September 30, 2013, which was requested on and dated October 1, 2013, and is signed by both Ms. Ebright and Mr. Vance. (Pl.'s Exhibit 10.) Handwritten next to the number of hours is the note "FMLA" with Ms. Miller's initials. (Miller Dep. 59:6–11.) Plaintiff argues the "FMLA" notation along with Mr. Vance's signature is evidence of Mr. Vance's knowledge of her FMLA requests.

Defendants counter that Ms. Miller wrote the notation onto the leave request after the initial request was granted. Ms. Miller testified during her deposition that per her typical routine she would have written "FMLA" on the request for billing purposes after Ms. Ebright's leave was approved on October 11, 2013. (Miller Dep. 58:8–24, 59:1–13, 73:19–24, 74:1–6.) Accordingly, the original request for leave had no notation of "FMLA" when it was signed by Ms. Ebright and Mr. Vance on October 1, 2013. (*Id.*; Vance Dep. 52:3–20.) Ms. Miller made the note on the form after the FMLA leave had been approved for record-keeping and billing documentation. (Miller Dep. 58:8–24, 59:1–13, 73:19–24, 74:1–6.) Ms. Ebright does not put forth any evidence that Mr. Vance was aware of her FMLA request and accordingly does not refute Ms. Miller's explanation.

Mr. Vance testified that he had no knowledge Ms. Ebright applied for FMLA leave until after he had decided to terminate her employment. (Vance Dep. 54:6–24, 57:1–4.) His role in the leave request process was to approve the initial leave, and Ms. Miller then retroactively noted

---

[3] Although official terminated on October 22, Plaintiff does not take issue with Defendant's assertion that Mr. Vance decided to terminate her employment on October 10.

if time was to be attributed to FMLA leave. (Vance Dep. 47:24, 48:1–7, 49:18–24, 51:1–5, 52:3–20, 55:1–14; Miller Dep. 58:8–24, 59:1–13, 73:19–24, 74:1–6.) Accordingly, Mr. Vance was unaware of Ms. Ebright's request until after he made the decision to terminate her employment.[4] Thus, Ms. Ebright fails to make a *prima facie* case for retaliation.

### b. Causal Connection

Assuming Mr. Vance did have knowledge of Ms. Ebright's FMLA request prior to deciding to terminate her, no reasonable jury could find a causal connection between that exercise of her rights and her termination. "An employee may not insulate himself from a pending dismissal by opportunistically invoking the FMLA." *Gipson v. Vought Aircraft Industries*, 387 F. App'x 548, 557 (6th Cir. 2010) (citing *Moorer v. Baptist Mem. Health Care Sys.*, 398 F.3d 469, 488–89 (6th Cir. 2005)). To establish an actionable retaliation claim, Ms. Ebright must demonstrate "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 135 S. Ct. 2517, 2533 (2013). Ms. Ebright must show that "but for" her taking medical leave under FMLA, she would not have been terminated. *Beard v. AAA of Mich.*, 593 F. App'x 447, 451 (6th Cir. 2014).

---

[4] Although Ms. Ebright did not raise the issue of the cat's paw theory, it warrants brief evaluation here as knowledge can be imputed onto the ultimate decision maker by virtue of a biased subordinate influencing the unbiased decision-maker to make an adverse employment decision. *Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582, n. 5 (6th Cir. 2009). If Ms. Ebright could establish that either Ms. Miller or Ms. Whittington sought to retaliate against her for her FMLA request and influenced Mr. Vance's decision to terminate her based on that retaliatory intent, Ms. Ebright could impute that motive and knowledge onto Mr. Vance. There is no evidence Ms. Whittington knew of Ms. Ebright's FMLA leave request. Similarly, there is no evidence that Ms. Miller, who was aware of the FMLA request, took issue with the request for FMLA leave as opposed to Ms. Ebright's work issues and attitude. Thus, the record is void of Ms. Miller or Ms. Whittington influencing Mr. Vance based on biases from the FMLA request.

"Where, as here, the employer claims that 'the dismissal would have occurred regardless of the employee's request for . . . FMLA leave,' the employee must convince the trier of fact otherwise." *Id.* (quoting *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)). It is not necessary that the termination actually be issued, as long as the "wheels of termination" had already been put into motion before the requested leave. *Id.*

The record demonstrates no causal connection between Ms. Ebright's FMLA request and her termination. To the contrary, Ms. Ebright's documented inter-office conflicts and poor work performance came to a head prior to her FMLA request. That Mr. Vance placed Ms. Ebright on leave after she left early for a doctor's appointment does not change this analysis.

First, Mr. Vance placed her on leave after she left work unexpectedly. She had an approved doctor's appointment the same day at noon, but left the office at 10:15 AM. It is not relevant that the parties dispute whether she left for medical reasons or because of a disagreement she had that morning with Ms. Whittington. Even if Ms. Ebright left work for medical reasons, under the FMLA, proper notice must be given. 29 U.S.C. § 2612(e); 29 C.F.R. §§ 825.302, 825.303. Although she had approval for a noon doctor's appointment, she chose to leave nearly two hours early. Ms. Ebright had a history of unexpected absences from her desk, and was warned previously not to stray. (Ebright Dep. 99:10–19.) During a previous meeting with Mr. Vance that Ms. Ebright had requested while still working as his assistant, he told her that "[h]e didn't want me to leave my desk. He wanted me to be at my desk at all times unless I went to lunch," and if she did leave her desk he asked that she have her phone on her so that he could be in contact with her. (Ebright Dep. 99:10–19.) Ms. Ebright reports that she agreed to Mr. Vance's requests. (Ebright Dep. 99:20–23.)

13

Moreover, while Ms. Ebright's early departure from work spurred Mr. Vance to take disciplinary action, evidence shows that it was not the reason for his decision to terminate her. Rather, Defendants have provided ample evidence of Ms. Ebright's tenuous employment history, including her own testimony that she had expected her employment to be terminated just a few weeks prior, during the September 20, 2013 meeting. (Ebright Dep. 202: 18–23.) According to the record, Ms. Ebright's performance was unsatisfactory and she had ongoing conflicts with coworkers. (Whittington Dep. 26:7–12 (referring to Ms. Ebright as "argumentative and confrontational").) Plaintiff points to a positive letter of recommendation provided by Ms. Miller as evidence of her satisfactory performance. (ECF 16-2.) This letter, however, was written in February of 2012, prior to her position with the building department or as the City Manager's assistant. Accordingly, there is no genuine issue of material fact that the "wheels of termination" were in motion prior her request for FMLA leave.

Finally, Plaintiff argues the temporal proximity between her request for FMLA leave and her termination establishes the causal connection. In some circumstances, temporal proximity can provide evidence of causality where an adverse employment action occurs "very close in time" after an employer learns of the protected activity. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524–25 (6th Cir. 2008). Courts often recognize, however, that "evidence in addition to temporal proximity is required to permit the inference." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). When analyzing a retaliation case where causation is based on temporal proximity, courts look to the totality of the circumstances to determine whether an inference of retaliatory motive can be drawn. *Id.* Here, the timeline of events in this case weakens any inference based on temporal proximity due to Ms. Ebright's prior performance problems. (Whittington Dep. 26:7–22.) Furthermore, Defendant's evidence of Ms. Ebright's

14

poor work performance and inter-office conflicts establish intervening reasons for her termination. *Id.* (Explaining that an intervening "obviously nonretaliatory basis" for the adverse action is evidence negating temporal proximity). Thus, no jury could reasonably find a causal connection between Ms. Ebright's request for FMLA leave and her termination.

### B. Discrimination

Ms. Ebright further alleges that Defendant terminated her employment in violation of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12112(a). The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of disability discrimination based upon indirect evidence of discriminatory motive, a plaintiff must show: he or she is an individual with a disability; (2) he or she is otherwise qualified for the position, with or without reasonable accommodation; (3) he or she suffered an adverse employment action; (4) the employer knew or had reason to know of his or her disability; and (5) after termination, the position remained open, or the employer replaced him or her by a non-disabled employee. *Nilles v. Givaudan Flavors Corp.*, Case No. 1:10-cv-919, 2012 U.S. Dist. LEXIS 60551, at *13 (S.D. Ohio May 1, 2012) (citing *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999)).

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S. C. § 12102(1). The ADA provides that "substantially limits" means:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity

as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Major life activities include basic activities "that the average person in the general population can perform with little or no difficulty. *Linser v. Ohio Dep't of Mental Health*, 2000 U.S. App. LEXIS 25644, at *7 (6th Cir. Oct. 6, 2000.) Included among these activities are "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* (quoting 29 C.R.F. § 1630.2(i)). The terms "substantially limits" and "major life activity" must be "interpreted strictly to create a demanding standard for qualifying as disabled." *Dunaway v. Ford Motor Co.*, 134 F. App'x 872, 877 (6th Cir. 2005) (quoting *Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002)). Moreover, "[a]n impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA." *Id.* (citation omitted).

Defendant challenges Ms. Ebright's ability to establish a *prima facie* case for multiple reasons including: that she was not disabled, if she was disabled that Mr. Vance had no knowledge of her disability, and that she was never denied a reasonable accommodation.

Generally, "short-term, temporary restrictions are not substantially limited." *Brown v. BKW Drywall Supply, Inc.*, 305 F.Supp.2d 814, 826 (S.D. Ohio 2004); *see also Fagan v. United Int'l Ins. Co.*, 128 F. Supp. 2d 182, 185 (S.D.N.Y. 2001) (stating that a "transitory impairment is not considered substantially limited") (citation omitted). Likewise, "intermittent, episodic impairments" typically are not considered to be disabilities. *Johnson v. City of Mason*, 101 F. Supp. 2d 566, 574 (S.D. Ohio 2000) (quoting *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995)); *see also EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001).

This Court, however, has acknowledged that, under certain circumstances, "flare-ups caused by an underlying chronic condition may constitute a disability if they occur with

sufficient frequency and are of sufficient duration and severity to substantially limit a major life activity." *Johnson v. JPMorgan & Co.*, 922 F. Supp. 2d 658, 670 (S.D. Ohio 2013) (quoting *Brown*, 305 F. Supp. 2d at 828–28). Moreover, while a condition may make an individual eligible for FMLA leave, it may not render him or her disabled. *Pollard v. ALSCO*, Case No. 1:09-cv-873, 2011 U.S. Dist. LEXIS 45367, at *20 (S.D. Ohio April 27, 2011) ("The fact that Plaintiff took FMLA leave does not equate to a disability under the anti-discrimination statutes.").

In addition to actually having a disability, a plaintiff must request an accommodation and a defendant must receive notice, either actual or constructive, that the plaintiff's request is linked to a disability. *Johnson*, 922 F. Supp.2d at 667; *see also Brown*, 305 F. Supp. 2d at 828 ("[A] person alleging a disability protected by the ADA must establish that his employer had either actual or constructive notice of the disability."). Significantly, "[k]nowing that an employee has health problems . . . is not the same as knowing that the employee suffers from a disability. *Brown*, 305 F. Supp. 2d at 829. "[M]any impairments do not impact an individual's life to the degree that they constitute a 'disability.'" *Johnson v. City of Mason*, 101 F. Supp. 2d. 566, 574 (S.D. Ohio 2000) (finding no disability where plaintiff injured his ankle, knee, and foot when he fell at work and claimed the impairment affected his major life activities of walking, standing, and working); *see also Farmer v. Nat'l City Corp.*, 1996 U.S. Dist. LEXIS 20941, at *16 (S.D. Ohio April 5, 1996).

Ms. Ebright fails to submit sufficient evidence for a reasonable juror to conclude that her condition constituted a disability under the ADA. She first went to Dr. Oberlander on September 25, 2013, complaining of neck pain. (Def.'s Exhibit 12, ECF No. 15-12.) At that appointment, he diagnosed her with torticollis, episodic tension headaches, and anxiety. (Def.'s Exhibit 12.)

He determined that the conditions "do[] not limit activities." (*Id.*) Ms. Ebright then returned to work on October 1, 2013. On October 2, 2013, she returned for another appointment. (Def.'s Exhibit 15, ECF No. 15-15.) On October 4, 2013, Dr. Oberlander returned her FMLA Certification of Healthcare Provider documentation, where he wrote that her diagnosis was "muscle tension headache related to stress." (Def.'s Exhibit 16.) Dr. Oberlander checked the box stating that the condition will "cause episodic flare-ups periodically preventing the employee from performing his/her job function." (Def.'s Exhibit 16.) He then wrote that he expected the flare-ups to occur intermittently, twice every twelve weeks and that the flare-ups would last between twenty-four and forty-eight hours. (Pl.'s Exhibit 12 at 10–11, ECF No.16-12.)

Accordingly, the evidence Ms. Ebright provides shows an impairment that, at worst, will intermittently prevent her from working. She presents no evidence of a condition that renders her disabled under the ADA. That Ms. Ebright took FMLA leave does not "equate to a disability." *Pollard*, 2011 U.S. Dist. LEXIS 45367, at *20; *see also Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1219 (10th Cir. 2007) (fact that employee applies for and receives FMLA leave does not mean the employer regarded the employee as disabled).

Even assuming that Ms. Ebright's condition was a disability within the meaning of the ADA, the evidence demonstrates that neither Mr. Vance, Ms. Miller, nor Ms. Whittington had either actual or constructive knowledge of this disability. As fully discussed above, Mr. Vance was unaware of Ms. Ebright's request for intermittent FMLA leave until after the decision to terminate her employment had been made. Even so, and acknowledging that Ms. Miller was aware of the FMLA request, awareness of a request for FMLA leave is not, without more, enough to establish knowledge of a disability. *See Nilles*, 2012 U.S. Dist. LEXIS 60551, at *20 n.22 ("Simply because [a supervisor] knew that Plaintiff took FMLA Leave . . . does not

establish that [the supervisor] knew that Plaintiff was disabled."); *see also Brown*, 305 F. Supp. 2d at 829 ("To construe an employer as having notice of an employee's disability every time an employee is absent from work for a medical reason would defy common sense."). Moreover, an "employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Brown*, 305 F. Supp. 2d at 829.

Ms. Ebright asserts that her FMLA Certification of Healthcare Provider documentation sent to Ms. Miller on October 10, 2013, "fully disclosed [her] disabling condition." (Mem. in Opp. at 13.) The documentation Ms. Ebright refers to, however, is not enough to establish knowledge of her disability.[6] Rather, the documentation provided on October 10, 2013, was to support Ms. Ebright's absence from work in September 2013, so that she could count that absence as FMLA leave. As detailed throughout, Ms. Ebright's FMLA request was for intermittent leave from work. Furthermore, when Ms. Ebright returned to work, she did so without requesting any accommodations and her symptoms were not readily apparent. *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (finding that where the disability is not "immediately obvious" and the employee never informed the employer of his disability, there could not be a genuine dispute as to whether the employer had knowledge of a disability). Thus, judgment is **GRANTED** for Defendant.

The Court's grant of summary judgment on the federal claims leaves before the Court only Plaintiff's state law claims under Ohio Revised Code § 4112. Where, as here, a district court has dismissed all of the claims over which it had original jurisdiction, the court may decline to exercise supplemental jurisdiction over the remaining claims. *See* 28 U.S.C. §

---

[6] The Court notes that when Ms. Ebright met with Mr. Vance to present him with a list of concerns on September 20, 2013, just five days before she was diagnosed with tension headaches, she never mentioned any disability. (Def.'s Exhibit 11, ECF No. 15-11.) Further, by her own testimony, Ms. Ebright only mentioned experiencing the headaches to Ms. Whittington "in passing." (Ebright Dep. 51:2–21.)

1367(c)(3). The decision whether to exercise supplemental jurisdiction over a claim is purely discretionary and depends on judicial economy, convenience, fairness, and comity. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). As a rule of thumb though, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc.*, 89 F.3d at 1254–55.

After analyzing the relevant considerations, the Court concludes that it will decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. The case has not proceeded to trial yet. Moreover, this case implicates questions of Ohio, not federal, law. These issues as well as the other state law issues are best resolved by an Ohio court.

Because the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim, the motion for summary judgment on that claim is **DENIED as moot**.

### IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment. The Clerk is **DIRECTED** to enter judgment in this action.

**IT IS SO ORDERED.**

3-27-2018
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT CHIEF JUDGE**